IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SCOTT C. STENN,               )
                              )
            Plaintiff,        )
                              )
      v.                      )      No.  12 C 3990
                              )
MICHAEL J. ASTRUE,            )
Commissioner of Social Security,)
                              )
            Defendant.        )

MEMORANDUM OPINION AND ORDER

On December 18, 2008 Scott Stenn ("Stenn") filed an application for Title II disability insurance benefits. Commissioner of the Social Security Administration Michael Astrue ("Commissioner") upheld the denial of Stenn's application and his later appeals, and Stenn now seeks the reversal or remand of Commissioner's decision. As is typical in these cases, the parties have filed cross-motions for summary judgment. For the reasons stated below, Commissioner's motion is granted while Stenn's is denied, and Commissioner's decision is thus upheld.

**Applicable Law**

Social security claimants must suffer from a disability, as defined under the Social Security Act ("Act"[1]), to be eligible for disability benefits. "Disability" is defined in Section 423(d)(1)(A) as "inability to engage in any substantial gainful

_____

[1] Citations to the Act will take the form "Section --," using the Title 42 numbering but omitting the prefatory "42 U.S.C."

activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."

Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995) sets out the customary five-step inquiry prescribed by 20 C.F.R. §404.1520(a)(4)[2] for determining whether a claimant is disabled:

>    (1) whether the claimant is currently employed;
>
>    (2) whether the claimant has a severe impairment;
>
>    (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Act], see 20 C.F.R. §404, Subpt. P, App. 1;
>
>    (4) whether the claimant can perform [his] past work; and
>
>    (5) whether the claimant is capable of performing work in the national economy.

In addition to being "under a disability," a claimant must also meet the insured-status requirements outlined in Section 416(i)(3) to receive disability benefits. In essence, that means Stenn must show he was under a disability before his insured status expired (Reg. §131(a); Martinez v. Astrue, 630 F.3d 693, 699 (7th Cir. 2011)).

## General Background

Stenn is a 53 year-old male with a college degree in

---

[2] Further citations to the regulations will take the form "Reg. §--," with the "--" reference omitting the prefatory "20 C.F.R. §404."

political science.  Before November 2003 he was a pit trader at Chicago's Mercantile Stock Exchange, but back pain caused him to cease that work.  From 2003 to 2009 he attempted to make money by trading stocks and developing real estate, but neither of those pursuits turned out to be fruitful (R. 51). In 2009 Stenn returned to the full-time work force, serving as a shipping service sales representative--a job he apparently still holds (R. 7-8).

## Medical Evidence

In November 2003 Stenn visited Dr. Mitchell Weisberg and reported that he had been having back pain, which was exacerbated by a tubing accident (R. 985).  Stenn had already been seeing a Dr. Jonathon Citow about his back troubles and was considering a spinal fusion (id.).  Dr. Weisberg diagnosed Stenn with chronic pain syndrome due to a herniated disc, suggested that he might need a spinal fusion and prescribed Neurontin for pain management (id.).

In March 2004 Stenn returned to Dr. Citow, who observed that Stenn suffered from "chronic back pain without radicular leg pain, numbness, weakness or paresthesias" (R. 991).  Dr. Citow noted that Stenn's medication was providing only partial relief (id.) and diagnosed Stenn with L5-S1 degenerative disease, suggesting that an L5-S1 fusion would be necessary to alleviate Stenn's pain (id.).

Before undergoing such a fusion, Stenn decided to try conservative pain management, administered through Dr. Howard Konowitz (R. 1181). In December 2004 Stenn visited Dr. Konowitz, who reported cervical radiculopathy with radiation to the rhomboids and scapula, and between January and October of 2005 Dr. Konowitz administered three rounds of epidural steroid injections (R. 1159-77).

In November 2005 Stenn determined that conservative treatment was not sufficiently alleviating his pain, so he decided to have surgery (R. 992, 1016). Dr. Jesse Butler, Stenn's surgeon, observed that Stenn had a lumbarized S1 with a congenital fusion at S1-S2 and that he would benefit from a two-level fusion (R. 1013-15, 1089-91). Dr. Butler performed a lumbar laminectomy at L4-L5 and a posterior spinal fusion from L4 to S1 (R. 1000). After the surgery Dr. Butler prescribed Norco, Zanaflex and Fentanyl patches for Stenn's pain (R. 1001, 1003). Stenn stopped using the patches[3] a few weeks after his surgery despite the fact that his pain persisted.

Stenn continued to see Drs. Weisberg, Butler and Konowitz after his surgery. Despite various medicinal regimens, facet injections, physical and water therapy and ultrasound and

---

[3] Stenn returned to the patches for a few months in 2007, but he once again stopped using the patches--by September 2007 at the latest--due to their side effects (which include drowsiness) (R. 987).

electrical stimulation, Stenn's pain persisted (R. 987) and, indeed, was continually aggravated by his sitting or standing for long periods (id.).

Stenn's continued pain was due at least in part to several of his postoperative activities. Shortly after the surgery Dr. Butler noted that Stenn's frequent use of a car aggravated his pain (R. 1092). In April 2006 a physician's assistant in Dr. Butler's office noted that Stenn's pain was aggravated by his playing paddle tennis on a cruise and attending a Bar Mitzvah, where Stenn carried a Torah and danced (R. 988, 1084). As late as March 2008 Dr. Konowitz reported that Stenn was working out with a trainer in a manner "inappropriate for his level of discomfort" (R. 1153)--a workout routine that included lunges, squats, abdominal crunches, pushups, pullups and boxing (R. 1154). Stenn also walked for 25 minutes on a treadmill five days a week (R. 24-25) and occasionally worked eight hour days (R. 1123).

In November 2006 Stenn began complaining of pain in his neck that radiated to his right shoulder (R. 1036-38). By February 2007 he reported that the pain caused tingling in his arm (R. 1036). Stenn also reported tingling to a new doctor, Dr. Lanoff, who noted paresthesia in two of Stenn's fingers (R. 995). Dr. Lanoff told Stenn that he should not be engaging in heavy lifting or prolonged standing and diagnosed him with "significant

degenerative changes at the C3-4 level with osteophytes and some disk protrusion," a large disc protrusion at the C5-6 level and "[m]ild general degenerative changes" at the C4-5 and C6-7 levels (R. 995).

In September 2007 Stenn visited with another new doctor, Dr. Timothy Lubenow (R. 987). Stenn again reported that prolonged sitting and standing aggravated his back pain (id.). Dr. Lubenow observed decreased range of motion in his lumbar spine and full strength in his lower extremities.

Next Stenn saw Dr. Avi Bernstein in May 2008 (R. 1050). Stenn told Dr. Bernstein that he was most comfortable when lying down (R. 1049). After reviewing a CT scan Dr. Bernstein reported a successfully healed fusion, though Stenn was still experiencing back pain (id.). Dr. Bernstein also discovered significant degenerative changes in Stenn's back and mild degenerative changes in Stenn's hip joints (R. 1054). Stenn returned to Dr. Bernstein again in June 2008, reporting "incapacitating" back pain (R. 1047). Stenn also mentioned that he had a "bicycle incident" while in Aspen, Colorado, which aggravated his back pain (id.). Dr. Bernstein recommended facet injections, which Dr. Konowitz eventually provided to no avail (R. 1047)).

Over the next two years or so Stenn continued to see his doctors due to his "progressively deteriorating lower back pain" (R. 1077, 1080). His doctors continued to diagnose him with

spinal problems (such as cervical degenerative disc disease and cervical disc herniation), for which his treatment--which included epidural steroid injections and muscle relaxants--was ineffective (see R. 1077). By June 2009 Dr. Weisberg reported that Stenn's lower back pain caused a "complete disability" (R. 1209).

In February 2009 Stenn underwent a residual functional capacity ("RFC") assessment, completed by a state agency reviewer ("State Reviewer") (R. 1122-29). That reviewer was charged with examining Stenn's medical records and determining Stenn's physical abilities as they related to potential full-time work. He determined (1) that Stenn could occasionally lift 20 pounds and frequently lift 10 pounds, (2) that he could stand, sit and/or walk, with breaks, for about six hours in an eight hour day and (3) that he could climb, stoop, kneel, crouch and crawl, but only occasionally (id.). As for Stenn's subjective complaints, the State Reviewer found them to be only partially credible (R. 1124). That assessment was later affirmed by another non-examining physician (R. 1194).

On March 1, 2010 Stenn had a second operation--an anterior cervical discectomy and fusion for his C5-C6 herniated disc (R. 1215-16). That surgery was intended to alleviate Stenn's neck and arm pain, but it succeeded with the latter only (R. 11).

## Procedural Background

On December 18, 2008 Stenn filed his benefits claim--as was
required by his insurance company--stating that his back pain
made driving difficult and prevented him from sitting or standing
for a long time (R. 918).  Stenn's claimed period of disability
began in November 2003 (id.).  Stenn's claim was denied on
February 18, 2009, and his application for reconsideration was
denied a few months later (R. 49).  Stenn then requested a
hearing, which was held on April 1, 2010 and conducted by
Administrative Law Judge Maren Dougherty (the "ALJ") (id.).

## Hearing Testimony

Two witnesses testified at the hearing:  Stenn himself and
vocational expert James Breen.  Stenn testified that the pain he
felt before his first surgery was like a "burning sciatic" (R.
13).  He stated that after the surgery the pain was less severe,
but was still around "24/7" (id.).  Because of his pain Stenn
could only stand or sit for 45 minutes before having to switch
positions due to discomfort (id.).  Walking was less
uncomfortable, but he would get cramps after 45 minutes (R. 16-
17).

During Stenn's alleged period of disability he worked two
jobs (R. 18-21).  First he tried to trade stocks using his own
money (R. 18), working from a small office and spending three to
five hours a day on a computer (R. 18, 28).  Stenn stated that he

would generally work from 8 a.m. until 11:30 a.m., at which point
he would take a break to walk, get coffee or occasionally--and
particularly when he was on Fentanyl patches--take a nap (R. 28-
29). Next Stenn worked as a real estate developer from both his
house and a small office (R. 19). He admitted to having driven
too much for that job, which aggravated his back pain (R. 21).
Stenn thought that he worked 15 to 20 hours a week while working
in real estate (id.).

Stenn acknowledged that he still engaged in several workout
activities during his claimed period of disability, such as
walking for 25 minutes three times a week, doing core exercises
and attempting yoga (though he stopped yoga after two months
because it was painful) (R. 24). Stenn also attended dinners,
movies and his daughter's swim meets, though the hard benches at
the swim meets caused him to have to alternate between sitting
and standing (R. 25, 30). Around the house Stenn cooked--usually
for 20 minutes, often standing but sometimes sitting--but did not
do any other chores (R. 27). According to his own assessment, a
gallon of milk was the most he could lift (R. 32). He reported
taking naps from 4 to 5:30 p.m. most days due to his poor sleep
at night, caused by back pain (R. 35).

In addition to his back pain, Stenn testified to the onset
of additional neck, shoulder and arm pain (R. 31-32). He claimed
that beginning, he believed, in May 2009 he felt tingling and

numbness in his arm (R. 31-32, 37).  Stenn suggested that the arm
pain made it difficult for him to use a computer mouse for over
15 minutes (R. 32).  He said that although his second surgery
successfully relieved his arm trouble, his back and neck were
still in pain (id.).  Stenn reported that after his second
surgery he spent two to three hours per day on his computer (R.
31).

As for the vocational expert, his very brief testimony began
with a categorization of Stenn's various jobs (R. 38-39).  He
characterized both Stenn's job as a floor trader and his new job
as a shipping services sale representative as semiskilled and
light work (id.).  His work as a real estate developer was also
described as light, but was considered skilled (id.).  Stenn's
brief stint as a stock trader was considered skilled and
sedentary (id.).

As to Stenn's ability to work a different job during his
alleged period of disability, the vocational expert stated that
none of Stenn's floor-trading skills was transferable (R. 39).
But he did report that there were numerous jobs available for
someone in Stenn's position--that is, someone who was between the
age of 43 and 48, who had a college education and Stenn's work
experience and who needed a job that allowed changing his or her
position every 45 minutes (R. 39).  Specifically, the expert said
that Stenn could have worked as a charge account clerk, an

information clerk or an order clerk, all of which are unskilled sedentary jobs (id.). Notably, the vocational expert said that bimanual dexterity is required on a frequent basis for the jobs open to Stenn (R. 41).

**ALJ's Decision**

Considering the medical evidence and testimony just described, the ALJ affirmed the determination that Stenn was not disabled under the terms of the Act (R. 59). She began her analysis by noting that Stenn last met the insured status requirements of the Act on December 31, 2008, so that Stenn needed to show that he was disabled on or before that date (R. 51). She then engaged in the earlier-described five-step disability inquiry.

At the first step the ALJ determined that neither Stenn's work as a real estate developer nor his work as a stock trader constituted substantial gainful activity (R. 51). At step two she found that Stenn had the severe impairments, as defined in Reg. §1520(c), of degenerative disc disease of the lumbar and cervical spine (R. 51). But because those impairments did not meet or medically equal one of the impairments listed in Reg. Part 404, Subpart P, App'x 1, Stenn had not proved a disability at step three (R. 52).[4]

_____

[4] ALJ Dougherty did find that Stenn's cervical stenosis and herniation met or medically equaled a listed disability in 2009 (R. 52)--but because his last insured date was in 2008, that

11

At that point the ALJ's next task was to determine Stenn's RFC. On that score the ALJ found that Stenn had the ability "to perform light work as defined in 20 C.F.R. 404.1567(b) except that he...can sit or stand for no more than 45 minutes at one time" (R. 52), and she reasoned that the medical evidence presented did not contradict her RFC finding. Although she did note Dr. Weisberg's passing comment in 2009 that Stenn's lower back pain caused a "complete disability" (R. 1209), she did not accord it material weight because "[Dr. Weisberg] is not an orthopedic or neurological specialist, his opinion is conclusory, and it may not consider the full array of possibilities for work and likely refers to the claimant's ability to perform his past relevant work" (R. 57). Instead the ALJ credited the opinion of the State Reviewer--which, it will be recalled, included a determination that Stenn could sit, stand or walk for six hours total in an eight hour day that involved normal breaks (see R. 57).

As for Stenn's complaints of disabling pain, the ALJ found them not to be entirely credible (R. 56). In support she cited the lengthy gap between two of Stenn's doctor visits, Stenn's overexertion through physical activities proscribed by doctor's warnings (such as paddle ball, biking and core exercises) and

---

finding did nothing to help Stenn establish that he was entitled to disability benefits (see Perkins v. Chater, 107 F.3d 1290, 1295 (7th Cir. 1997)).

Stenn's ability to engage in everyday activities (such as going to the movies and to dinners, driving and taking care of his personal needs) (id.).  ALJ Dougherty did note Stenn's contention that he needs to lie down in the afternoon, but she cited Stenn's many early-day activities as the cause of that necessity (id.), apparently concluding that Stenn's custom of napping in the afternoon would not interfere with his ability to hold a full-time job.

With her RFC determination complete, the ALJ determined that Stenn could not have performed, on a full-time basis, any of his past relevant work (R. 57).  Next, then, was whether Stenn was capable of performing alternative jobs.  Given his age, education, work experience and RFC, the ALJ determined--based largely on the testimony of the vocational expert and its consistency with the Dictionary of Occupational Titles--that Stenn could serve as a charge account clerk, an information clerk or an order clerk (all sedentary jobs), each of which existed in ample numbers (R. 58).  Thus, according to the ALJ, Stenn was not disabled under the Act between November 2003 and December 2008, and he was therefore not eligible for Social Security benefits (R. 58-59).

## Validity of Commissioner's Decision

Stenn brings two challenges to the ALJ's (and hence Commissioner's) decision:  that both the RFC determination and

13

the credibility determination were erroneous.  Stenn maintains
that both challenges are legal in nature.

Whether Stenn is in fact alleging only legal error is
important, for the standards of review for legal and factual
errors differ.  Haynes v. Barnhart, 416 F.3d 621, 626 (7th Cir.
2005) (citations and internal quotation marks omitted) aptly
summarizes the difference in analysis:

> We review the ALJ's legal conclusions de novo.  We
> deferentially review the ALJ's factual determinations,
> however, and will affirm a decision if it is supported
> by substantial evidence.  Substantial evidence...[is]
> such relevant evidence as a reasonable mind might
> accept as adequate to support a conclusion.  We review
> the record as a whole, but we are not to reweigh the
> evidence or substitute our own judgment for that of the
> ALJ.  In rendering a decision, the ALJ must build a
> logical bridge from the evidence to his conclusion.
> The ALJ need not, however, provide a complete written
> evaluation of every piece of testimony and evidence.

So as this opinion reviews both of Stenn's challenges, it will
not simply take his word for the characterization of his
arguments as legal.

**Challenge to ALJ's RFC Determination**

Stenn's challenge of the RFC determination includes several
arguments, the first of which is factual despite Stenn's
contention to the contrary.  In that regard Stenn challenges the
ALJ's finding that he could stand for six hours in an eight hour
workday.  Stenn admits that the ALJ had evidence to rely on in
reaching her conclusion, not least of which was the report of the
State Examiner, but he maintains that a different report, written

by Dr. Lanoff, should have been credited instead.  As Stenn would have it, the "significant evidence" in Dr. Lanoff's report is a single phrase that says Stenn could not engage in "prolonged standing."

There is no need to decide whether the ALJ was within her discretion to trust the report of the State Examiner over Dr. Lanoff's report, because the two reports are in no way inconsistent.  Indeed, the ALJ unquestionably recognized that Stenn could not engage in "prolonged standing"--her findings explicitly stated that Stenn could stand for only 45 minutes at a time (R. 52) and that he was no longer able to engage in his former occupation of pit trader because it required prolonged standing (R. 57).

As for the cumulative amount of time Stenn could stand in a given day, Dr. Lanoff's report is silent.  Hence it was perfectly logical for the ALJ to rely on the specific conclusions of the State Reviewer in that respect, especially considering Stenn's own testimony that the pain caused by standing for too long could be relieved by alternating between standing and sitting (R. 31).  In sum, the single nonspecific term in Dr. Lanoff's report does not undercut the substantial evidence on which the ALJ based her conclusion.

Stenn next argues that it was legal error for the ALJ not to mention Dr. Lanoff's report in her reasoning.  But the quoted

excerpt from <u>Haynes</u> (which in its original form quoted in turn from <u>Diaz v. Chater</u>, 55 F.3d 300, 308 (7th Cir. 1995)) teaches that an ALJ need not discuss every piece of evidence submitted as long as she considers the line of evidence in which a given piece falls. Here the ALJ specifically took into account Stenn's inability to stand for a prolonged period, and Dr. Lanoff's report added nothing more on that score. Clearly a lack of reference to that report was not legal error.

Stenn next asserts that the ALJ failed to consider Stenn's limited bimanual dexterity. As Stenn notes, the vocational expert testified that the three jobs found available to Stenn could not be filled by someone with bimanual dexterity limitations (R. 40-41)--and according to Stenn the medical evidence indicates that he had bimanual dexterity limitations due to cervical radiculopathy during his alleged period of disability.

In that respect Stenn highlights the records of Dr. Konowitz (who observed cervical radiculopathy in 2005), Dr. Weisberg (who noted neck pain radiating to Stenn's shoulder in 2006 and arm tingling in 2007) and Dr. Lanoff (whose March 2007 report mentions paresthesia in Stenn's fingers). According to Stenn the ALJ's failure to explain explicitly why the clerk positions were suitable for him despite his diagnosis of cervical radiculopathy constituted legal error.

There is indeed evidence that Stenn had bimanual dexterity limitations due to cervical radiculopathy. In 2009 Dr. Weisberg noted that cervical radiculopathy was responsible for significant pain in Stenn's right arm (R. 1210), which was presumably the cause of Stenn's asserted inability to use a computer mouse for more than 15 minutes at a time. But as Commissioner points out, Dr. Weisberg stated that problem was of "new onset" in 2009 (R.1210)--a fact confirmed by Stenn's own testimony. When asked by the ALJ how long he had experienced physical limitation in his right arm, Stenn reported an onset date of around May 2009. So even if Stenn's 2009 bimanual dexterity issues rendered him "disabled" as defined by the Act,[5] that disability would not have begun before Stenn's last insured date (December 31, 2008), and it thus could not serve as the basis for disability benefits (Stevenson v. Chater, 105 F.3d 1151, 1154 (7th Cir. 1997)).

That, though, is not the end of Stenn's argument. All the evidence of cervical radiculopathy pointed out in Stenn's brief was from pre-2009 records, while Stenn was still fully insured under the Act. If such cervical radiculopathy caused the requisite bimanual dexterity limitations before Stenn's last insured date, a disability finding might have been justified. At the very least the ALJ should have considered any line of

---

[5] ALJ Dougherty actually found that Stenn would have qualified for benefits in 2009 were it not for the fact that his insured status had expired (R. 52).

17

evidence that tended to show Stenn experienced trouble with his bimanual dexterity pre-2009.

Stenn's problem is that no such line of evidence exists. Most of the pre-2009 reports noting cervical radiculopathy do not say that the symptoms extended to Stenn's arm, nor do they discuss bimanual dexterity limitations. Reports from February and March of 2007 note tingling in Stenn's arm and fingers, but those reports make no mention of Stenn having trouble with the actual use of his arm or hand (R. 995, 1036). In fact Stenn testified that he traded stocks on a computer--a sedentary job, just like the clerk positions--from 2006 until at least December 2008 (R. 913-15), as contrasted with the situation that developed in 2009, when he experienced true bimanual disability limitations while using a computer mouse. In short, then, there simply was no "line of evidence" for the ALJ to consider as to any inability on Stenn's part to use both hands effectively pre-2009.

Stenn's final RFC-based contention is a conclusory statement suggesting that the ALJ failed to build a "logical bridge from the evidence to her conclusion" (S. Mem. 18). That contention flat-out fails, for the ALJ explained at length the bases for her conclusion, most notably the State Examiner's report. In finding that report credible, the ALJ found corroboration in (1) the numerous activities in which Stenn engaged while allegedly disabled and (2) the lack of any clear medical evidence

contradicting such a finding.  That explanation constructs a
perfectly logical bridge, also calling for the rejection of
Stenn's position that the ALJ's RFC determination is reversibly
erroneous.

**Challenge to ALJ's Credibility Determination**

When medical evidence does not on its own show a claimant's
inability to sustain full-time work, an ALJ can still rely on a
claimant's subjective complaints of pain as the basis for a
disability finding (see Carradine v. Barnhart, 360 F.3d 751, 753
(7th Cir. 2004)).  It has already been explained at length that
the ALJ found the medical evidence did not itself support a
disability finding.  As for the other possibility--that looking
to a claimant's subjective complaints--the ALJ found that Stenn
was only partially credible and that his claims of "disabling"
pain were overblown, negating his chance at proving a disability
under the Act.  Stenn now challenges that finding.

In that regard Stenn mistakenly contends that the judicial
review of his challenge to the ALJ's credibility determination
should be de novo.  Under this circuit's jurisprudence an ALJ's
credibility determinations will be left undisturbed unless they
are "patently wrong" (Diaz, 55 F.3d at 308) or are based on
"serious errors of reasoning" (Carradine, 360 F.3d at 754).  It
is true that a reviewing court has more room to operate when a
credibility determination is based on objective factors, as

opposed to an ALJ's subjective observations (see <u>Indoranto v.</u> <u>Barnhart</u>, 374 F.3d 470, 474 (7th Cir. 2004)), but that principle is a far cry from de novo review. As our Court of Appeals requires, this opinion will review the ALJ's credibility finding simply to determine whether it had a logical basis (see <u>Elder v.</u> <u>Astrue</u>, 529 F.3d 408, 413-14 (7th Cir. 2008)).

Most of Stenn's arguments are vain attempts to undercut the damaging evidence upon which the ALJ rested her credibility finding. For instance, Stenn argues that, contrary to the ALJ's finding, he was not overexerting himself during his claimed period of disability. Thus he asserts that he played paddle ball for only two minutes before aggravating his back pain, and he points out that the bicycle incident he experienced in Aspen was the result of road biking, not mountain biking. But the ALJ did not suggest otherwise, and the fact remains that a person with truly debilitating back pain would not be a likely candidate for playing paddle ball or engaging in road biking to begin with. And though Stenn also argues that the core exercises in which he engaged with a personal trainer have served a therapeutic purpose, that contention is at odds with Dr. Konowitz' observations (R. 1154):

> He did attend six visits of physical therapy with
> Jersey Dorman for which he only does not fully follow
> his exercise program and instead he does many other
> activities that I feel could be significantly
> aggravating factors for the patient's pain state with
> his personal trainer as well as his chiropractor such

as multiple sets of lunges, squats, abdominal crunches
on the ball and other activities on the ball, pushups,
pull ups on a bar for which the trainers force him,
boxing for which he demonstrates a lot of these
activities to me today in the room, which are of a
twisting nature for example.

Hence the ALJ had more than ample evidence to reach two
conclusions: (1) that Stenn's pain was not so severe and constant
as to prevent him from participating in the mentioned activities
and (2) that his pain would have been lessened, and his ability
to work a full-time job greater, if he had listened to his
doctors.  Stenn's attempt to downplay the import of the evidence
illustrating his own overexertion is nothing more than
impermissible second guessing--an invitation to reweigh the
evidence that this Court is legally bound to avoid (see <u>Jens v.
Barnhart</u>, 347 F.3d 209, 212 (7th Cir. 2003)).

Stenn also asserts that the ALJ should not have considered
his ability to engage in certain activities of daily living when
making a credibility determination.  Stenn maintains that his
ability to swim, stretch, drive, cook, walk on a treadmill and go
to dinner and the movies is not inconsistent with an inability to
work a full-time job.  Of course some participating in one or
more of those activities would not on its own prove that an
individual could work a full-time job, but the fact that Stenn
engaged in each of them regularly certainly tends to show that he
was capable of remaining active for extended periods of time.

Those activities of daily living therefore help to provide a logical basis upon which the ALJ could support her credibility finding, despite Stenn's belief that the ALJ assigned them too much weight.

Next Stenn maintains that a large gap in his visits to doctors--from March 2004 with Dr. Citow to December 2004 with Dr. Konowitz--does not show that his complaints of disabling pain were incredible, given that he ended up following Dr. Citow's advice and having surgery on his back. Once again Stenn fails to dispel the logicality ??? of the ALJ's reasoning. Stenn's eventual decision to have surgery does help support his claim of disabling pain, but it is completely unrelated to the ALJ's observation that a person with truly disabling back pain is unlikely to go nine months without seeing a doctor. In sum, then, the ALJ had plenty of evidence on which to base her credibility finding, and this Court will not reweigh that evidence to determine whether it too would have found Stenn only partially credible.

Stenn's final argument contesting the ALJ's credibility determination is a legal one. Stenn contends (1) that his drowsiness--a side effect from Fentanyl patches--prevented him from working full-time and (2) that the ALJ failed to consider his drowsiness in discounting his asserted need to lie down throughout the day. Stenn is correct that the side effects of

necessary medication should be considered when an ALJ is making a disability determination (see Social Security Ruling 96-7p). So if Stenn's Fentanyl patches really did make him too drowsy to work, it would have been error for the ALJ not to have considered that fact. But Stenn himself admitted that he used the patches for only a brief period after his first surgery and for a month or two in 2007. There was therefore no way for the Fentanyl-induced drowsiness to prevent Stenn from working full-time for 12 months--the amount of time necessary for a non-life-threatening impairment to be considered a disability (Section 423(d)(1)(A))--and thus the ALJ had no reason to consider whether the Fentanyl patches prevented Stenn from working.

In sum, then, the ALJ's credibility determination is not "marred by legal error," as Stenn suggests. So his final argument goes by the boards, just as his earlier ones did.

## Conclusion

To conclude, Stenn has failed to show that the ALJ lacked substantial evidence for her RFC or credibility determinations or that she committed harmful legal error in reviewing the denial of Stenn's claim for disability benefits. Stenn's motion is therefore denied, Commissioner's motion is granted, and this action is dismissed.

_____
Milton I. Shadur
Senior United States District Judge

Date: August 6, 2013

23